**EXHIBIT 1**

## IN THE MATTER OF THE ARBITRATION ACT, 1996

## AND

## IN THE MATTER OF AN ARBITRATION

**BETWEEN**

### ALBUS DENIZCILIK LTD STI

<u>Claimants</u>

(Owners)

**-and-**

### PROGRESS BULK CARRIERS

<u>Respondents</u>

(Charterers)

### M/V "ALBUS"

### Charterparty dated 3rd September 2010

———————

### FINAL AWARD

———————

**Whereas**

1

1.  By a charter-party dated 3rd September 2010 (the Charterparty) the Claimants (Owners) time-chartered the m.v. Albus (the vessel) to the Respondents (Charterers) for a period of "abt 4/6 mos (abt means +/- 20 days) in chopt via sbs sps sas aa awiwl". The contract was evidenced by a fixture re-cap also dated 3rd September 2010 recording the agreed terms and "…OWISE AS PER BIBI M / PBC CP OTHER THEN (sic) LOGICAL AND M/TERMS AMENDMENTS".

2.  It was not disputed that the pro-forma charterparty to which the recap referred was a time charterparty on a substantially amended New York Produce Exchange form (1946 edition) for the m/v BIBI-M dated 17th February 2010 made between Denak Depoculuk VE NAK AS as owners and the Charterers.

3.  On 26th November 2011 the parties agreed an addendum to the charterparty to take effect from 13th December 2010 at 13.00 hours (GMT) in the following terms:

    *"- ABT 4 TO ABT 6 MONTH T/C PERIOD WITH PLUS/MINUS 20 DAYS IN CHOPT*
    *- HIRE USD 10,500 DIOT*
    *- NEW PERIOD/HIRE TO BE VALID FROM MIN DURATION OF LAST C/P I.E. 13TH DECEMBER 1300 HRS GMT*
    *- ALL OTHER TERMS/DETAILS REMAINS AS PER LAST CP DTD. 3RD SEPT 10"*

4.  The vessel was delivered to Charterers on 4th September 2010 on dropping outer pilot at Doula and redelivered to Owners at Chittagong anchorage on 13th June 2011.

5.  The recap and/or Charterparty provided inter alia as follows:

    *"t/c period of abt 4/6 mos (abt means +/- 20 days) in chopt. . .. . .."*

    *"bunker cls: bor to be same as bod same prices to apply bends. Prices usd500/700 pmt for ifo and mdo resp. Bod abt 320 ifo and abt 65 mt mdo.. ..."* (We observed that the prices in another version of the recap, dated 3rd September 2010 at 23:01, which was annexed to Owners' Reply to Charterers' Reply to Defence to Counterclaim, provided that bunker prices were to be *"usd550/850 pmt for ifo and mdo resp."*, but neither party used these prices in their final hire statements. We therefore disregarded this latter recap and its bunker clause, which was presumably superseded by the recap annexed to the Claim Submissions.)

    *Clause 4*

    *That the charterers shall pay for the use and hire of the said Vessel at the rate of [USD 12,400] daily including overtime per day or pro rata to be paid every 15 days in advance commencing on and from the day and time of her delivery, as aforesaid, and at and after the same rate for any part of a month/day; hire to continue until the hour of the day and time of her redelivery in like good order and condition, ordinary wear and tear excepted,*

3

*to the Owners (unless lost) at on dropping last outward seapilot one safe port/anchorage within following ranges:*

*boston / bahia blanca incl usg / carribs or durban / west africa / gib / skaw incl med / bsea / cont / baltic*

*Clause 5*

*"Payment of said hire to be made to owner's bank in United States Currency, every 15 days in advance and for the last 15 days half month or part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes due, if so required by owners. ....".*

RIDER CLAUSES

*Clause 56   Protective Clauses*

*The Both To Blame Collision Clause, New Jason Clause and Conwartime 2004 to be incorporated in this Charter Party and all Bills of Lading issued under this Charter Party, and together with General Clause Paramount, U.S. Clause Paramount or Canadian Clause Paramount, where applicable, are deemed to be incorporated in all Bills of Lading under this Charter Party.*

*Clause 58   Cargo Exclusions:*

*Vessel to be employed in carrying lawful merchandise excluding: any goods of dangerous and hazardous, chemical products of injurious, inflammable or corrosive nature .....*

RECAP

*"cgo/tradexcl:*

*"no cgoes (regardless of allowance procedures or their specific names listed below) are allowed below stowage factor 21 cuft per mt. and further exceptions as follows:*

*ALL INJURIOUS. HAZARDOUS, DANGEROUS AND INFLAMMABLE GOODS AND ANY GOODS LISTED IN THE IMDG CODE ....."*

*..............*

*"COPPER CONCENTRATES ALLOWED (L/D AS PER IMO AND LOCAL RULES AND REGULATIONS)"*

6.   Differences arose between the parties concerning the Owners' claims for hire, alternatively for damages, for damages for shortages in redelivery bunker quantities, and for damages for breach of the geographical redelivery provisions of the charterparty in that the place of redelivery, Chittagong, was outside the agreed redelivery ranges. The Owners also claimed compound interest pursuant to Section 49 of the Arbitration Act 1996 and their costs.

7.   Charterers, for their part, contested Owners' methods of quantifying their claims and counterclaimed for damages in respect of Owners' refusal to carry a cargo of copper concentrates. Charterers also indicated their intention to apply

for a declaration that a lien purportedly exercised by Owners was invalid, but this counterclaim was subsequently abandoned.

8.  On 19th May 2011 the Charterers appointed me, the undersigned Charles L. Measter of 2430 Bent Twig, Seabrook Island, South Carolina 29455, USA as their nominated arbitrator and on the same day the Owners appointed me, the undersigned Charles Baker of The Oast House, 5 Bourne Lane, Tonbridge, TN9 1LG, as the arbitrator nominated by them. Both appointments were subsequently made subject by express agreement to the LMAA terms current at the time when the arbitration was commenced which were the LMAA Terms (2006). On 11th September 2013 the two nominated arbitrators, having found themselves unable to agree on a matter relating to the arbitration, appointed the undersigned Michael Baker-Harber as third arbitrator pursuant to Paragraph 8(b) of the LMAA Terms (2006).

9.  The seat of the arbitration is London, England.

10.  The Charterers were represented by Marine Law Solicitors and the Owners by Davies Johnson & Co.

11.  On 1st September 2011 Davies Johnson & Co served Owners' Claim Submissions, together with supporting documents and on 28th November 2011 Marine Law Solicitors served Charterers' Defence and Counterclaim Submissions and supporting documents. Charterers also made an application for an interim

6

final declaratory award on 16th December 2011, but this was withdrawn very shortly thereafter.

12. On 9th January 2012 Owners served Reply & Defence to Counterclaim submissions and further exhibits and Charterers served their Reply to Defence to Counterclaim on 1st March 2012. Owners then delivered their Reply to Charterers' Reply to Defence to Counterclaim on 9th October 2012, as well as an application for a Final Interim Award for the balance shown due to Owners in Charterers' "Provisional Hire Statements". The tribunal (as then constituted) invited Charterers to deal with any new points raised by Owners' last submissions regarding the Counterclaim and received Charterers' response on 15th January 2013.

13. On 1st February 2013 Davies Johnson & Co emailed the tribunal regarding what they claimed to be inaccuracies in Charterers' deadweight calculations. The parties then agreed to make final submissions on the vessel's deadweight cargo capacity when it performed a replacement fixture from Yangon to Conakry. Charterers' submissions on this aspect were served on 8th March 2013 and Owners responded on 27th March with a short report from their expert, Captain Nicholas Paines.

14. The tribunal declared all submissions closed on 10th April 2013 and informed the parties that it would proceed to its award.

**NOW WE**, the said Charles Baker and Michael Baker-Harber, having taken upon ourselves the burden of this reference and having carefully and conscientiously considered the documentary evidence and submissions put before us by the parties and having given due weight thereto and by a majority decision (Mr Measter dissenting) and for the reasons attached to this award, **DO HEREBY MAKE, ISSUE AND PUBLISH** this our **FINAL ARBITRATION AWARD** as follows:

A. **WE FIND AND HOLD** that the Owners' claims succeed to the extent of US$604,040.60 and no more.

B. **WE AWARD AND DIRECT** that the Charterers shall forthwith pay to the Owners the amounts of US$556,539.10 and US$47,501.50 together with interest thereon at 4.5% per annum and *pro rata* compounded at three-monthly rests from the following dates until the date of payment:

   i)      on US$556,539.10 from 13ᵗʰ May 2011, and

   ii)     on US$US$47,501.50 from 15ᵗʰ July 2011

C. **WE AWARD AND DIRECT** that the Charterers shall bear their own costs of the reference and shall pay the costs of the Owners on the standard basis, such recoverable costs of the Owners, if not agreed, to be assessed, in the Owners' option, either by the English High Court of Justice or by us in an award

of costs, for which we hereby reserve our jurisdiction as may be necessary.

D. **WE AWARD AND DIRECT** that the Charterers shall bear and pay the costs of this award which we hereby determine in the sums of £19,750.00 and US$14,094.00 provided that, if the Owners shall have paid any part of the said costs, they shall be entitled to the immediate reimbursement by the Charterers of the amounts so paid together with interest thereon at 4% per annum and *pro rata* compounded at three-monthly rests from the date of such payment until the date of reimbursement.

E. **WE DECLARE** that this award, issued in two originals, is final in respect of all matters that we have finally determined in it.

GIVEN UNDER OUR HANDS in England this 31st day of January 2014.

Signed ................................................................

Charles G. C. H. Baker

Tonbridge, this 31st day of January 2014

Signed ................................................................

Michael Baker-Harber

London, this 31st day of January 2014

9

M.V. "ALBUS"

**Charterparty dated 3rd September 2010**

**REASONS FOR AND FORMING PART OF THE**

**FINAL ARBITRATION AWARD**

## (A) The background facts

1. The vessel is a 1984-built Handysize bulk carrier, registered in Istanbul, with 5 holds/hatches, LOA 173.16 metres and with a summer deadweight of 26,615.448 mt. on 9.742 metres summer salt water draught.

2. The vessel was delivered into Charterers' service on 4th September 2010.

3. On 17th February 2011 Charterers agreed terms for a sub-charter, on subjects, to Seapioneer Ltd for a period of 2.5 to 4.5 months maximum, which at that time matched the balance of the extended head charter period and provided for the same redelivery ranges. The next day Seapioneer informed Charterers that they could lift the subjects and fix the vessel clean *"providing we can load Copper Concentrate. Pls confirm"*.

4.  On or before 16th February Charterers, who were no doubt aware of Seapioneer's intention to load copper concentrates, had asked the master whether the vessel could load such a cargo. The master replied as follows:

> *"Please kindly note the bulk cooper (sic) concentrate (group /a according to do imsbc code) density should be less than 1.78t/m³ accordingly the ship's certificate."*

5.  The master was in effect stating his understanding that a cargo of copper concentrates would have a lower density than that permitted for his vessel.

6.  It was not disputed that the stowage factor of copper concentrates, which according to Thomas on Stowage is anything between 0.39 m³ and 0.50 m³ per mt, is less than the charterparty limit of 21 cubic feet/mt (0.594653779 m³ per mt).

7.  Owners supported the master's position by pointing out that the vessel was not constructed to carry such a cargo and that the master had a discretion to refuse to load a cargo which he perceived as posing a threat to the safety of the crew, vessel and the cargo itself.

8.  Charterers maintained throughout that Clause 58 (as amended by the recap) permitted them to load copper concentrates. In the face of Owners' refusal to allow this cargo, Charterers sub-chartered the vessel instead to Louis Dreyfus Commodities

Suisse SA to carry a cargo of bagged sugar from Tuticorin to Chittagong. The vessel arrived on 28th March at Chittagong, but did not complete discharging until around 12th June.

9.  The last payment of hire was made on 13th April 2011, about 2 months before completion of discharge of the cargo. Owners did not exercise their contractual right to withdraw the vessel from Charterers' service. No doubt they were conscious that they were obliged in any event under the terms of the relevant bills of lading to complete the voyage.

10. The vessel was purportedly redelivered by Charterers at 20.35 hrs on 13th June 2011. The message from the master which certified this redelivery time was transmitted at 18.36 hrs GMT+3 via Inmarsat-C Mobile. Although Owners' initial hire statements alternated between showing hire as ceasing to be due at 14.15 hrs GMT and 20.35 hrs GMT, Owners finally claimed that hire continued to run up to 20.35 hrs GMT. We have taken the time of 20.35 hrs mentioned in the master's email of 13th June 2010 as having been expressed as GMT, given that the email was sent at 21.36 hrs GMT, in other words just less than an hour after the event described.

11. In their Defence Submissions Charterers "accepted that the vessel was redelivered at Chittagong". We have not seen any contemporaneous correspondence between the parties around

the time of the 'redelivery' and the submissions are silent as to what communications passed between the parties at that time.

12. The submissions on both sides proceeded, however, on the basis that the charterparty did come to an end, notwithstanding that Chittagong was not within an agreed redelivery range. This is not a case, such as the *Alaskan Trader* (No. 2)1, where the owners chose not to treat the charterers' claim that the charter was at an end as a repudiation, but continued to hold the vessel at charterers' disposal and to claim further instalments of hire.

13. In this case Owners fixed the vessel to Olam International Ltd on 25th May 2011 for a voyage from Yangon to West Africa, which involved a two-day ballast voyage from Chittagong.

## (B) When and how the charterparty ended

14. The premature redelivery of a vessel prior to the earliest date agreed for redelivery is generally characterised in English law as a repudiation. We accept that the same applies if a charterer purports to redeliver at a place outside the agreed redelivery range. Repudiation can take several forms: it may be by renunciation (evincing an intention not to perform a contract or

---

1 [1983] 2 Lloyd's Rep. 645

only in a way that involves a serious breach), impossibility (actual incapability to perform, either at all or without committing a serious breach) or by serious actual breach.

15. In the present case, if Owners are correct in saying that Charterers' breach brought the charter to an end, this will have occurred by reason of (a) Charterers having 'renounced' their obligations under the contract, by making it clear that they had no further use for the vessel after completing the Chittagong fixture, and (b) Owners' 'acceptance' by words or conduct of Charterers' repudiation.

16. Owners claimed that they fixed the next voyage from Yangon to West Africa in reasonable mitigation of their losses resulting from the Charterers' wrongful termination of the charter. The question of mitigation would not have arisen, if Owners had instead opted to affirm the contract and ignore the repudiatory breach, since "an unaccepted repudiation (of an executory contract) is a thing writ in water"2. Owners therefore 'accepted' Charterers' repudiatory breach as terminating the charter and their hire statement reflected this reality by showing hire as ceasing to be due after the 'redelivery' on 13th June.

---

2 Howard v. Pickford Tool Co. [1951] 1 K.B. 417, 421

17. We do not know when Charterers' decision to consider themselves no longer bound by the charter was communicated to Owners. This might have happened after they realised that Owners would not be moved on the question of loading copper concentrates or only as the long-drawn out discharging of cargo at Chittagong had come to an end, but this is not important, since the time for the next episode in the continued execution of the charter did not arise until discharge was completed and we saw no evidence that either party treated the charterparty as at an end before that time.

18. We assumed that Charterers' actual repudiatory breach occurred only after the vessel completed discharging at Chittagong. Charterers would have had no reason to walk away beforehand from the head charter, as they were earning substantial sums in demurrage under their sub-charterparty with Louis Dreyfus and also had a 5% balance of freight to collect, which was only payable after completion of discharge. Owners, for their part, were entitled to treat Charterers' anticipatory breach (namely, Charterers' clear indication that they had no intention to employ the vessel after completion of discharge at Chittagong) as putting an immediate end to the charter, but there was no evidence that they did so. Owners were equally entitled to wait until the time for actual performance (in other words the continued employment of the vessel after discharge was completed) before electing whether to affirm the contract or 'accept' Charterers'

actual repudiation. These two alternative forms of termination are not exhaustive. What we found to have happened lies somewhere between the two.

19. Charterers have never suggested that Owners affirmed the charter party after Charterers' purported redelivery. Owners' concluded the replacement fixture with Olam International Ltd on 25th May, some three weeks before 'redelivery' under the present time charter. Although the laycan dates initially agreed with Olam International Ltd were "1 – 10th June", we consider that, viewing the evidence (such as it is) as a whole, it would not be correct as a matter of law to say that Owners' conduct in re-fixing the vessel on 25th May immediately brought the time charter to an end. Whilst such conduct constituted an 'acceptance' of Charterers' anticipatory breach, it is our view that such 'acceptance' had merely prospective effect and brought the time charter to an end only once Charterers had redelivered the vessel after completing discharging. Until that happened, neither party's words nor conduct were consistent with an intention that their rights and obligations under the charter should cease immediately.

20. Charterers submitted that the redelivery at Chittagong "arose directly as a result of Owners' breach of charterparty", namely the latter's refusal in February to accept orders to load copper concentrates. If Charterers are right in this, it means that it was

instead Owners' refusal that constituted the relevant repudiatory breach, which Charterers accepted by words or conduct, thereby bringing the charter to an end, again only after completion of discharge at Chittagong.

21. Which of these alternative scenarios is the correct one was the main issue in this arbitration, the solution to which depends on an analysis of the facts and construction of the charterparty, to which we now turn.

## (C) Owners' refusal to load copper concentrates

22. Charterers disagreed with the master's refusal and Owners' interpretation of Clause 58. They claimed that clause 58 of the charter, as amended by the cargo exclusions clause in the recap, specifically permitted the carriage of bulk copper concentrates, so long as they were loaded and discharged in accordance with IMO and local rules and regulations. As Charterers put it in an email on 17th February 2011:

> *"C/P CLAUSE OVERWRITE THE OWNERS PROVISION WHICH OWNERS ARE WELL AWARE....."*

23. The words "Owners' provision" referred to the introductory words to the cargo exclusions clause in the recap, which had been cited in Owners' preceding email, and which reads:

*"no cgoes (regardless of allowance procedures or their specific names listed below) are allowed below stowage factor 21 cuft per mt. ...".*

24. Owners' reply, as subsequently developed by Davies Johnson & Co, made the following points:

   a) the stowage factor of copper concentrates would be below the minimum of 21 cubic feet per metric tonne ($0.594653779$ m³ per MT) set out at the beginning of the cargo exclusions clause in the recap;

   b) that absolute stipulation, whose application is not stated to be limited to any specifically identified cargoes, overrides any subsequent provision in the cargo exclusions clause which gives qualified consent to the carriage of certain specific types of cargo, including copper concentrates;

   c) the stowage factor of copper concentrates would also be below the minimum of 1.78 MT per m³ (or $0.561797753$ m³ per MT) stipulated by the vessel's classification society, Bureau Veritas;

   d) the IMSBC Code, which has replaced the Code of Safe Practice for Solid Bulk Cargoes (BC Code) and became mandatory on January 1, 2011, expressly provides that *"Ships nominated for bulk loading should be suitable for the intended cargo".* A vessel which is not allowed by its

classification society to load such a dense cargo is manifestly not 'suitable' to load a cargo with a stowage factor as low as that of copper concentrates and would be in breach of IMO (more specifically SOLAS) rules and regulations, were it to do so; and

e) the recap also contains a general exclusion of "All injurious, hazardous, dangerous and inflammable goods" and a cargo of copper concentrates with a stowage factor below 21 cubic feet/MT would contravene this general exclusion and expose the vessel's structure to the risk of damage and consequent danger.

25. The immediately preceding two paragraphs set out the main thrust of the parties' rival contentions on the interpretation of the charterparty, in particular Clause 58 (as amended by the recap).

26. Both parties attached considerable weight to the fact that the stowage factor of copper concentrates, according to the extract produced by Owners from Thomas on Stowage, varies from 0.39 to 0.5 m³ per MT. Accordingly, even concentrates of the least density (0.5 m³/MT) would have a stowage factor below the charterparty minimum of 0.594653779 m³/MT.

27. Charterers said that the fact that the stowage factor of copper concentrates always falls below the charterparty minimum was

crucial in considering the interplay between two provisions in the recap. Those provisions are:

> "no cgoes (regardless of allowance procedures or their specific names listed below) are allowed below stowage factor 21 cuft per mt ..."

> "Copper Concentrates allowed (L/D as per IMO and Local Rules and Regulations)"

28. Charterers argued that, since no copper concentrates have a stowage factor above 21 cuft / mt, the specific permission granted by the latter words must necessarily prevail over the prohibition contained in the former.

29. They also pointed out that the specific reference to copper concentrates was to be found in the recap, rather than merely in a pro forma charterparty and that Owners' construction of these two provisions would leave the words "Copper Concentrates allowed" entirely devoid of effect.

30. Owners replied that there was no direct conflict between the two provisions. The words relied on by Owners were the opening words to the relevant section of the recap and specified a minimum stowage factor applicable to any and every cargo carried *"regardless of allowance procedures or their specific names listed below"*. The introductory words to the cargo exclusions clause in the recap are unambiguously of universal

application and contain no suggestion that they somehow do not apply to certain cargoes. In the same way the sub-clause that provides:

> *"All cargoes to be loaded, stowed, handled and discharged in accordance with the latest IMO rules and regulations as well as local and canal regulations."*

applies to all cargoes, whether hazardous or otherwise.

31.  Notwithstanding the attractive ingenuity with which Charterers' argument was developed before us by Marine Law, and which found favour with Mr Measter, the majority on the tribunal have to say that we think it fails at almost every stage.

32.  Copper concentrates is merely one of several cargoes specifically "listed below" which were allowed, generally subject to additional conditions being satisfied. Just as it does not appear to have occurred to Charterers at the time of fixing that all copper concentrates have a stowage factor below the charterparty minimum, it also seems unlikely that Owners or their brokers were actively conscious of this fact. This is no doubt one reason why prudent owners insert an overriding introductory provision, such as the one in question. The fact that the apparent allowance of copper concentrates is effectively meaningless so far as this particular vessel is concerned does not mean that a strained interpretation of the clause is to be preferred.

21

33. The two provisions are not "conflicted", as Charterers would have us accept. Nor do we accept that Owners' or the master's constructive knowledge of the nature and stowage factor of copper concentrates (or of any other species of bulk cargo) influences the proper construction of Clause 58.

34. When chartering out their vessel an owner will expressly exclude any cargo that presents unacceptable dangers particular to that category of goods, such as a tendency to ignite or corrode, and allow certain other potentially hazardous goods, subject to specific or general restrictions. In this case the restriction concerning minimum stowage factor applies to all cargoes (whether hazardous or otherwise), whilst the restriction contained in the words *"(L/D as per IMO and local rules and regulations)"* applies expressly not only to copper concentrates, but also to all other cargoes by reason of the sub-clause quoted in paragraph 30 above.

35. We would observe that, even without this sub-clause (or the similar words in parentheses that follow the mention of copper concentrates in the recap), such restrictions would necessarily be implied, since it cannot have been intended that the master should be under a contractual duty to load a cargo contrary to IMO Codes of Safe Practice (whether mandatory or not) or local regulations.

36. What is quite clear is that, in the context of a time charter intended to give Charterers wide cargo options, it is impossible to impute to the parties an intention that clause 58 is to be interpreted to mean that Owners are obliged to carry a cargo of a density prohibited by the vessel's classification society. In *Gan Insurance v Tai Ping Insurance*[3], Mance LJ emphasised the importance of considering the implications of two competing constructions:

> *"In my opinion, a court when construing any document should always have an eye to the consequences of a particular construction, even if they often only serve as a check on an obvious meaning or a restraint upon adoption of conceivable but unbusinesslike meaning."*

37. The importance of avoiding excessive loads being placed on the vessel's tank tops is moreover expressly emphasised not only in the cargo exclusions clause in the recap, but also elsewhere in the charterparty, such as in clause 48.

38. We would also add that a term is necessarily implied into every charterparty that the master has a discretion (and arguably a duty) to reject an order to load a cargo or sail by a route or for a destination that he reasonably considers will expose the vessel,

---

[3] [2001] EWCA Civ 1047

crew or cargo to danger. The clauses of a charterparty are very seldom interpreted as intended to limit such discretion. An example of the operation of this discretion is often found in the context of orders to proceed to a port or area, which is specifically named in the charter, but where the master becomes aware of some danger during the approach voyage or even before sailing for or after arrival at the port. As the learned authors of Time Charters (6th Edition by T. Coghlin, A. W. Baker QC, J. Kenny and J D. Kimball state in their discussion of Clause 8 of the NYPE Form:

> *"One situation in which the master is not only entitled but may also be obliged to refuse the orders of the charterers is where these endanger the safety of his ship or her cargo."*

39. Furthermore, the mere fact that a cargo is allowed under the charter, in the sense that it is either expressly listed as a conditionally permitted cargo (as in the case of copper concentrates) or it is a lawful cargo that is not expressly excluded (such as, for example, steel coils), cannot mean that the parties intended that such a cargo could be loaded irrespective of its stowage factor. The stowage factor of steel coils varies from around 0.16 to 0.47 m³/mt, which is far less than the charterparty minimum of 21 cubic ft /mt (or 0.594653779 m³ / mt).

40. If Owners were told that the next cargo was to be steel coils, they would be able to refuse such orders on any one of several grounds. The stowage factor limit in the recap is one such ground. Or they could rely on the general prohibition of "injurious, hazardous, dangerous ... goods", in that such goods would clearly be potentially injurious to this particular vessel's tank tops; or they could simply withhold their consent to such shipment under Art.IV, rule 6 of the Hague Rules. It does not follow from the overlapping nature of these similar, but distinct remedies that any one of them is to be regarded as having only a partial or diluted effect.

41. The fact that copper concentrates are not specifically excluded, but are expressly "allowed" (subject to certain conditions), goes no further than to place them in the same category as any other non-excluded goods, such as the steel coils mentioned above. They still have to be safe for this vessel. Thus, if a cargo of copper concentrates had a certified Transportable Moisture Limit or actual moisture content above recommended levels, Owners would be fully entitled to reject the cargo, even though nothing is said in the charterparty about liquefaction risks.

42. Taking all of these features together, the inference was overwhelming that such a copper concentrates cargo would also not comply with the contractual reservation set out in parentheses in the recap after the mention of copper

25

concentrates, namely "ALLOWED (L/D AS PER IMO AND LOCAL RULES AND REGULATIONS)". Irrespective of the manner in which a copper concentrates cargo might be loaded, the stowage factor would always be less than the permitted minimum. This does not mean that the words in parentheses are to be treated as wholly redundant, for they serve as an express reminder that compliance with IMO rules and guidelines is a necessary prerequisite of loading any cargo whatsoever.

43. One further point which we would mention, although not essential to our reasoning, concerns the somewhat awkwardly worded Clause 56. After brief hesitation we concluded that this clause incorporated the Hague Rules into the charterparty "as far as applicable" (per Lord Somervell in *Adamastos Shipping v. Anglo-Saxon Petroleum* (*The Saxon Star*)4. It is true that the wording of the clause is infelicitous, but we accept that the only sensible meaning that can be given to the clause is to treat all the 'protective clauses' which are listed (and not just those referred to in the first line) as being intended to be incorporated into both the charterparty and any bills of lading issued thereunder. The usual reasons for including a clause to this effect are (i) to ensure a high degree of consistency between the terms of carriage set out in the charter and those contained in any bills of lading issued by

----

4  [1958] 1 Lloyd's Rep. 73

Charterers on behalf of Owners and (ii) to give back to the parties the valuable duties, rights and immunities accorded by the Hague Rules that would otherwise be removed by the routine deletion of clause 24.

44. The obligation under Article III 1(a) of the Hague Rules to exercise due diligence to make the ship seaworthy before and at the beginning of (each) voyage cannot co-exist with the express or implied term under Clause 58 which Charterers say obliges the master to carry a cargo possessing a stowage factor below the limit permitted by the vessel's classification society. The duty of seaworthiness under Article III 1(a) is to be regarded as 'paramount', in the presence of which the construction of the amended Clause 58 urged upon us by Charterers cannot survive intact.

45. Finally, we would also add that, if the vessel had loaded copper concentrates and suffered a structural failure, resulting in loss or damage to the vessel and cargo (not to mention loss of life or personal injury), there would be a very real possibility that the vessel's hull and P & I insurers would refuse cover. P & I Clubs within or outside the International Group generally provide that no claim shall be recoverable if the Directors shall be of the opinion that the carriage, trade or voyage was imprudent, unsafe, unduly hazardous or improper. Furthermore, both P & I Clubs and hull insurers are entitled to deny liability under Section 39(5)

of the Marine Insurance Act 1906 if *"with the privity of the assured, the ship is sent to sea in an unseaworthy state"*. It is hard to conceive of any wording in a time charter that could be interpreted as intended to authorise such consequences.

46.  In view of our conclusion that Owners were entitled (and, indeed, obliged) to reject Charterers' orders to load copper concentrates, it follows that Owners did not repudiate the charter, but that Charterers' purported early redelivery at Chittagong was a repudiatory breach, which Owners properly accepted as putting an end to the charter.

## (D) Claims for outstanding hire and other matters

47.  In addition to their claim for damages for redelivery in the wrong area, Owners' initially claimed hire up to the time of redelivery at Chittagong and redelivery bunkers in the aggregate amount of US$594,976.38, but later revised this figure to US$579,536.75. Charterers sought to reduce this by setting off the following defences and/or rights of equitable set-off and/or accounting adjustments:

   a) A counterclaim for US$335,394.39 under the principle of equitable set-off in respect of losses resulting from Owners' refusal to carry copper concentrates;

b) a denial that Owners are entitled to claim for shortage of bunkers on redelivery;

c) a denial of Owners' claim for damages for breach of the redelivery provisions

d) Charterers also questioned Owners' deduction of commissions.

48. We consider each of these matters in turn below.

a) <u>Equitable set-off of Charterers' counterclaim</u>

49. In the light of our finding under (C) above it is unnecessary to consider Charterers' argument in paragraph 47. a).

b) <u>Bunkers on redelivery</u>

50. The vessel was delivered with 330 mt IFO and 79 mt MDO. Bunkers ROB at redelivery at Chittagong were reported to be IFO 43.00 mt and MDO 5.6 mt. Owners claimed the difference between delivery and redelivery quantities at prices actually paid at Chittagong on different dates after redelivery. The amounts finally claimed were US$40,563.70 for 287 mt IFO and US$5,209.54 for 73.40 mt MDO.

51. The relevant clause in the charterparty is the following provision in the recap:

> *"bunker cls: bor to be same as bod same prices to apply bends*
> *Prices usd500/700 pmt for ifo and mdo resp. Bod abt 320 ifo and*
> *abt 65 mt mdo ......... Any small discrepancies on del/redel qties to*
> *be settled as per cp prices......."*

52. Charterers argued that the inclusion of the word "abt" in the Owners' estimate of the bunkers on delivery indicated an intention that the redelivery quantities should also be qualified by "abt" and that Charterers should therefore have an allowance of 5%.

53. This point was conceded by Owners, albeit somewhat to our surprise. For what it is worth, our reading of this provision is that the word "about" is intended only to reflect the fact that, at the date of the fixture, Owners could only estimate the quantity of bunkers on delivery, which was information Charterers would need to have for their voyage planning. It is not permissible simply to imply an intention to apply "about" to redelivery quantities when the parties have chosen not to use the word when describing such quantities, despite using it twice to qualify delivery quantities in the next sentence, as well as in numerous other parts of the recap.

54. The provision that bunkers on redelivery match the quantity on delivery seems to us to be inserted essentially for accounting certainty. It is implicitly accepted by the clause *("Any small discrepancies ...")* that in practice redelivery quantities can never

precisely match the same figure as on delivery. However, that does not mean that the parties did not intend to base their financial rights and obligations on the principle that delivery and redelivery quantities would be the same. The advantage of such an arrangement is that there is no room for argument as to quite what is meant by "about".

55. Although Owners say in their Reply and Defence to Counterclaim that they have revised their calculations to reflect Charterers' point concerning "about" being applied also to redelivery quantities, thereby reducing them by 5%, the Hire Statement attached to those submissions still shows shortfalls of 287 mt IFO and 73.40 mt MDO. The same quantities are also used in Owners' further revised Final Hire Statement on pages 41 and 42 of Owners' Exhibit 3.

56. We have assumed that Owners overlooked the concession they made and we have accordingly reduced the shortfall quantities as follows:

> *Actual bunker quantities on delivery*
> IFO 330.00 mt
> MDO 79.00 mt
>
> *Contractual redelivery quantities with 5% allowance*
> IFO 330.00 mt +/- 5% = Min 313.50 mt – Max 346.50 mt
> MDO 79.00 mt +/- 5% = Min 75.05 mt – Max 82.95 mt

*Actual redelivery quantities*
IFO 43.00 mt
MDO 5.60 mt

*Shortfalls*
IFO 313.50 mt less 43.00 mt = 270.50 mt
MDO 75.05 mt less 5.60 mt = 69.45 mt

57. Both parties considered that the proper measure of damages for shortage of bunkers on redelivery was the difference between the charterparty prices (USD500 and 700 for IFO and MDO respectively) and the market prices at Chittagong. The charterparty prices are intended to measure the value of bunkers physically on board at delivery and redelivery, which is a different function to measuring a party's loss in the event of breach, although such prices will determine whether any claim exists in the first place. One member of the tribunal was troubled by the issue of redelivery bunkers, quantities and prices, but on reflection has concluded he was wrong and we have therefore accepted the parties' submissions, in principle at least.

58. We found that the average price paid by Owners for IFO at Chittagong was US$641.34 and US$770.97 for MDO and that such prices represented market prices at the time.

*Difference between Chittagong prices*
*and charterparty prices*
IFO   US$641.34 less US$500          =       US$141.34 per mt

| MDO   US$770.97 less US$700 | = | US$70.97 per mt |
|---|---|---|
| *Owners' loss* | | |
| IFO   270.50 mt x US$141.34 | = | US$38,232.47 |
| MDO   69.45 mt x US$70.97 | = | US$4,928.87 |
| Total bunker redelivery claim | = | US$43,161.34 |

### c) Claim for breach of redelivery range

59. Although Charterers' primary defence was that Owners' refusal to carry the copper concentrates cargo meant that Owners were responsible for the early termination of the charter and the vessel's redelivery outside the agreed redelivery ranges, they also questioned in detail the calculations underlying Owners' claim under this head.

60. Owners claimed damages representing the hire that would have been earned at the charterparty rate for ballasting back to the nearest point in the nearest redelivery range (Durban), less the notional earnings during the time required to do so. The notional earnings are based on the vessel being in the condition and performing in accordance with the charterparty warranties, whereas in reality the vessel suffered delay following engine breakdowns from unsuitable fuel oil stemmed (by Owners) at Chittagong and slow steaming.

33

61. Both parties recognised that expert evidence might have to be called. Owners consulted Captain Nicholas Paines of Newman Giles Paines & Company Ltd, who are well-known consulting marine engineers and ship surveyors. Captain Paines' report was exhibited to Owners' Reply to Charterers' Reply to Defence to Counterclaim Submissions.

62. Having considered the parties' contentions and the helpful report prepared by Captain Paines, we noted that Charterers ultimately took issue only with the quantity of cargo that could have been loaded at Yangon. In an email dated 25th March 2013 Captain Paines, having considered the vessel's hydrostatic data, attributed the difference in the respective parties' calculations to a typing error in the recap, which gives a deadweight of 27,437.30 mt on a FW draft of 9.995 m, when in fact the draft figure should have read 9.959 m. Based on the maximum FW draft at Yangon of 8.5 m we agree that the vessel could not have loaded more than 20,603 mt, whereas 20,600 mt was in fact loaded. The difference of 3 mt. is *de minimis*.

63. After taking on board Charterers' comments regarding Owners' calculation of the Time Charter Equivalent Owners presented revised calculations based on a voyage that could have been undertaken had the vessel not encountered difficulties en route. In that way the TCE did not penalise Charterers for the problems

34

that the vessel encountered in practice in stemming bunkers that
proved to be unsuitable.

64. We accepted that Owners' claim under this head succeeded to the
extent of US$47,501.50.

    d) <u>Commissions</u>

65. The total hire earned under the charter according to Owners'
Final Hire Statement amounted to:

    (a)    100 days hire @ US$ 12,400 per day (4 September 2010
        13.00 GMT to 13 December 2010 13.00 GMT)
        = US$1,240,000.00, and

    (b)    182 days 07 hrs 35 mins hire @ US$10,500.00 per day
        (13 December 2010 13.00 GMT to 13 June 2011 20.35
        GMT) = US$1,914,317.71

66. The commissions payable on hire are set out at clauses 27 and 28
of the proforma charterparty, and these were not altered or
amended by the terms of the recap nor by the addendum agreed
on 26th November 2010. The commissions were 1.25% brokerage
commission to Bosa Chartering Co. of Istanbul (clause 27) and
3.75% address commission payable to Charterers (clause 28).

67. The Final Hire Statement put forward by Owners showed that,
whilst total commissions of 5% were deducted by Owners from

hire for the period from 4th September 2010 to 12th January 2011, thereafter Owners deducted commissions of only 2.5%. Charterers commented in their Defence that they did not understand the basis for this distinction.

68. Owners responded by stating that Charterers had:

> "....paid 2.5% to Bosa (after deducting 5% from hire payments) until the charter became problematic. .........The reason why Owners have hire statements with 2.5% for the unpaid hires and commissions is that the Charterers were not paying/have not paid (besides hire), a major part of broker commissions. Since by definition and practice broker commissions are ultimately payable by the Owners, Owners seek to collect these payments from Charterers and pay to their brokers later the sums dues (sic) to them..."

69. Unsurprisingly the calculations underlying this explanation failed to impress Charterers, who pointed out that only 1.25% was supposed to be paid to Bosa Chartering and that the remaining commission of 3.75% was address commission which fell to be deducted by Charterers in any event. They added that the accounting of brokerage was a matter for Bosa Chartering and Charterers, this being "customary".

70. Whilst it is undoubtedly true that brokerage is very commonly deducted from freight or hire by charterers before paying the balance to owners, it is nonetheless well settled by authorities

such as *Les Affréteurs Réunis v. Walford*[5] that the legal obligation to pay brokerage rests on owners. This follows from the fact that commission is stated to be due only on hire "earned and paid". Owners were therefore entitled to insist that they receive hire without deduction, apart from address commission of 3.75%.

71.  It would appear from Owners' Final Hire Statement that they initially waived their right to receive hire without deduction of brokerage for the period up to 12th January 2011. It was, however, at all times open to Owners to reassert their right to receive remaining hire payments without such deductions.

72.  We therefore have not disturbed the deduction of total commissions at 5% for the period up to 13.00 hrs on 12th January 2011, but have allowed a deduction only of the address commission of 3.75% thereafter. Address commission for the period of 153.31597 days (13.00 hrs on 12th January to 20.35 hrs on 13th June 2011) at US$393.75 per day equals US$60,368.16. The total deductions for commissions accordingly equal US$138,118.16. Owners will, of course, be responsible for

---

[5] [1919] A.C. 801

37

accounting to Bosa Chartering in respect of the brokerage on further hire received from Charterers.

73. The adjustments that fall to be made to Owners' Final Hire Statement dated 21st December 2011 as a result of our findings are limited to (i) the amount to be deducted for commissions, which is increased by US$20,3852, and (ii) the damages for insufficient bunkers on redelivery, which are reduced by US$2,612.43 (from US$45,773.77 to US$43,161.34). These changes reduce the balance of hire due to US$556,539.10.

## (E) Interest and Costs

74. The Owners are entitled to interest on their claims. The last hire payment received by Owners was on 13th April 2011, about two months prior to redelivery, after which Owners' incurred losses in respect of the post-redelivery period when the vessel undertook a voyage from Yangon to West Africa. That last instalment would have been in respect of the next 15 days. We have thought it appropriate to award interest on the balance of hire due from 13th May 2011. So far as concerns the claim for damages for redelivery outside the agreed range, we have taken as the start point for interest the later date of 15th July 2011. We consider the awards of interest above to be at a fair commercial rate and reasonable for the periods in question.

75. The Owners having been successful, they are entitled to their costs and we have awarded them accordingly. We have seen no reason to depart from the general principle that costs follow the event.

IN THE MATTER OF THE ARBITRATION ACT 1996

AND

IN THE MATTER OF AN ARBITRATION

Between

ALBUS DENIZCILIK LTD STI

Claimants
(Owners)

-and-

PROGRESS BULK CARRIERS

Respondents
(Charterers)

M/V "ALBUS"

Charterparty dated 3rd September 2010

---

FINAL AWARD

---

31st January 2014